## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Dykes Feed & Fertilizer, Inc., dba W E Dykes Feed & Fertilizer, on behalf of itself and others similarly situated.<br><br>　　　　　Plaintiff,<br><br>　　　vs.<br><br>Agrium Inc., Agrium U.S. Inc., Mosaic Company, Mosaic Crop Nutrition L.L.C, Potash Corporation of Saskatchewan Inc., PCS Sales (USA), Inc., JSC Uralkali, RUE PA Belaruskali, RUE PA Belarussian Potash Company, BPC Chicago L.L.C., JSC Silvinit and JSC International Potash Company.<br><br>　　　　　Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>**JURY TRIAL DEMAND** |

## I.    INTRODUCTION

1.     Plaintiff brings this action on behalf of itself individually and on behalf of plaintiff class (the "Class") consisting of all persons and entities who purchased potash in the United States directly from one or more named defendants between July 1, 2003 and the present (the "Class Period"). Potash is key agricultural fertilizer and defendants are the leading suppliers of potash in the world. In 2007 defendants collectively generated well over $2 billion in gross revenue. During the Class Period, defendants sold millions of tons of potash in the United States.

2.     During the 1990s, potash producers, particularly those located in the former Soviet Union, increased the supply of potash in world markets, resulting in substantial price declines and limiting profits of producers around the world. Plaintiff is informed and believes, and thereon alleges, that in order to maintain price stability and increase profitability, defendants

conspired and combined to fix, raise, maintain, and stabilize the price at which potash was sold in the United States. As part of, and in furtherance of, this conspiracy, defendants exchanged sensitive, non-public information about prices, capacity, sales volumes, and demand; allocated market shares, customers, and volumes to be sold; and coordinated on output, including the limitation of production. Plaintiff is informed and believes that defendants fraudulently concealed their anticompetitive conduct from plaintiff and the Class in furtherance of the conspiracy. As a result of defendants' unlawful conduct, plaintiff and the other members of the Class paid artificially inflated prices fro potash during the Class Period. Such prices exceeded the amount they would have paid if the price for potash had been determined by a competitive market.

## II.    JURISDICTION AND VENUE

3.    Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from defendants' violations of Section 1 of the Sherman Act (15 U.S.C.§ 1).

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and by Sections 4 and 16 of the Clayton Act (15 U.S.C.§§ 15(a) and 26).

5.    Venue is proper in this judicial district because at least one of the defendants resides in this judicial district, is licensed to do business, or is doing business in this judicial district; and because a substantial portion of the affected interstate trade and commerce described below has been carried out in this judicial district.

## III.    PARTIES

**A.    Plaintiff**

6.    Plaintiff Dykes Dairyman Supplier Inc, dba W E Dykes Feed & Fertilizer is a business entity with its headquarters located in Montpelier, Louisiana. Plaintiff purchased potash

directly from one or more defendants during the Class Period. Plaintiff's purchases included, but were not limited to, purchases of potash from defendant Mosaic Company.

**B.    Defendants**

**Agrium**

7.    Defendant Agrium Inc. is a Canadian corporation with its headquarters in Calgary, Canada. During the Class Period, Agrium Inc. sold and distributed potash throughout the United States.

8.    Agrium U.S. Inc. is a wholly-owned subsidiary of Agrium, Inc. with its headquarters in Denver, Colorado. During the Class Period, Agrium U.S. Inc. sold and distributed potash throughout the United States.

9.    Defendant Agrium Inc. and Agrium U.S. Inc. are collectively referred to herein as "Agrium."

**Mosaic**

10.    Defendant Mosaic Company is a Delaware corporation with its headquarters in Plymouth, Minnesota. Mosaic is the world's second largest potash producer by capacity, and distributes approximately one half of its potash in North America, where it holds the leading market share in the potash industry. During the Class Period, Mosaic sold and distributed potash throughout the United States.

11.    Defendant Mosaic Crop Nutrition L.L.C. is a limited liability company with its headquarters in Riverview, Florida. Mosaic Crop Nutrition L.L.C. is a wholly-owned operating subsidiary of Mosaic Company. During the Class Period, Mosaic Crop Nutrition L.L.C. sold and distributed potash throughout the United States.

12.    Defendants Mosaic Company and Mosaic Crop Nutrition L.L.C. are collectively referred to herein as "Mosaic."

**PCS**

13.    Defendant Potash Corporation of Saskatchewan Inc. ("Potash Corp.") is a Canadian corporation with its principal place of business in Saskatchewan, Canada. Potash Corp.

is the world's largest potash producer with revenues of $764 million in 2007 from potash sales in the United States. During the Class Period, Potash Corp. sold and distributed potash throughout the United States.

14.    PCS Sales (USA), Inc. ("PCS Sales") is a Delaware corporation with its headquarters in Northbrook, Illinois. PCS Sales is a wholly owned subsidiary of defendant Potash Corp. During the Class Period, PCS Sales sold and distributed potash throughout the United States.

15.    Defendants Potash Corp. and PCS Sales are collectively referred to herein as "PCS."

**JCS Uralkali**

16.    Defendant JSC Uralkali ("Uralkali") is a Russian joint stock company with its headquarters in Moscow, Russia. As of April 2005, Uralkali owned a one-half interest in the Belarussian Potash Company, a joint venture with defendant Belaruskali, through which it markets, sells and distributes potash. During the Class Period, Uralkali sold and distributed potash throughout the United States.

**Belaruskali**

17.    RUE PA Belaruskali ("Belaruskali") is a business entity organized under the laws of Belarus with its headquarters in Soligorsk, Republic of Belarus. As of April 2005, Belaruskali owned a one half interest in the Belarussion Potash Company, through which it markets, sells and distributes potash. During the Class Period, Belaruskali sold and distributed potash throughout the United States.

**Belarussian Potash Company**

18.    Defendant RUE PA Belarussian Potash Company ("Belarussian Potash Company") is a joint venture between Uralkali and Belaruskali with its headquarters in Minsk, Republic of Belarus. Established in April 2005, BPC is the exclusive distributor of potash produced by Uralkali and Belaruskali throughout the world. In 2006, Belarussian Potash

Company accounted for approximately 34% of world potash export volume. During the Class Period, Belarussian Potash Company sold and distributed potash throughout the United States.

19.    BPC Chicago L.L.C. is a limited liability company with its headquarters in Buffalo Grove, Illinois. BPC Chicago L.L.C. is a wholly-owned operating subsidiary of Belarussian Potash Company. During the Class Period, BPC Chicago L.L.C. sold and distributed potash throughout the United States.

20.    Defendants Belarussian Potash Company and BPC Chicago L.L.C. are collectively referred to herein as "BPC."

**Silvinit**

21.    JSC Silvinit ("Silvinit") is a Russian joint stock company with its headquarters in Solikamsk, Russia. During the Class Period, Silvinit sold and distributed potash throughout the United States.

**International Potash Company**

22.    JSC International Potash Company ("IPC") is Russian joint stock company with its headquarters in Moscow, Russia. IPC, the exclusive distributor of potash produced by Silvinit, accounted for approximately 14% of world potash export volume. During the Class Period, IPC sold and distributed potash throughout the United States.


## IV.    AGENTS AND CO-CONSPIRATORS

23.    Various entities not named as defendants have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof. Plaintiff reserves the right to name some or all of these entities as defendants at a later date.

24.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or done by duly authorized officers, agents, employees, or representatives or each co-conspirator while actively engaged in the management direction or control of its affairs.

25.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## V.     CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action both on behalf of itself, and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), on behalf of the following class (the "Class"):

> All persons and entities who purchased potash in the United States directly from one or more defendant between July 1, 2003 and the present. Excluded from the Class are defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

27.     Plaintiff does not know the exact number of class members because such information is in the exclusive control of defendants. Plaintiff believes that due to the nature of the trade and commerce involved there are most likely thousands of class members geographically dispersed throughout the United States such that joinder of all class members is impracticable.

28.     Plaintiff's claims are typical of the claims of the class in that plaintiff is a direct purchaser of potash, plaintiff and all Class members were damaged by the same wrongful conduct of defendants and their co-conspirators as alleged herein, and the relief sought is common to the class.

29.     Numerous questions of law or fact arise from defendants' anticompetitive conduct that is common to the Class, including but not limited to:

      a.     whether defendants combined or conspired to fix, raise, maintain, or stabilize prices of potash sold in the United States;

      b.     whether defendants combined or conspired to restrict output of potash sold in the United States;

      c.      whether defendants shared non-public information, allocated markets and customers, restricted output of potash sold in the United States and committed other conduct in furtherance of the alleged conspiracy;

      d.      whether defendants' conduct caused the prices of potash sold in the United States to be at artificially high and noncompetitive levels;

      e.      whether plaintiff and the other members of the Class were injured by defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

      f.      whether plaintiff and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief.

30.     These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

31.     Plaintiff will fairly and adequately represent the interests of the Class in that plaintiff is a direct purchaser of potash and has no conflict with any other members of the Class. Furthermore, plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

32.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

33.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

34.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

## VI.    TRADE AND COMMERCE

35.    During the Class Period, each defendant, directly or through its subsidiaries, sold potash in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

36.    During the Class Period, defendants collectively controlled a majority of the market for potash, both globally and in the United States.

37.    Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VII.    FACTUAL ALLEGATIONS

### A.    The Potash Industry

38.    Potash refers to mineral and chemical salts that contain potassium. Potash is mined from naturally occurring ore deposits that were formed when seas and oceans evaporated, many of which are now covered with several thousand feet of earth. It is principally used as an agricultural fertilizer because it is a source of soluble potassium, which is one of three primary nutrients required for plant growth and maturation. Farmers throughout the world use large amounts of potash to help crops fight disease and enhance crop yields. There is no cost-effective substitute for potash.

39.    Fertilizers, including potash, are critical inputs in crop production. Restrictions in the supply of potash, like those described herein, may result in lower crop yields and ultimately to higher prices for food commodities, particularly for those crops that require significant quantities of potash.

40.    Potash reserves are confined to relatively few areas throughout the world. While over 150 countries consume potash, mostly as fertilizer, there are only 15 countries that produce notable quantities of it. Belarus, Canada, Germany, Israel, Jordan and Russia have about 90% of the global potash supply within their borders. Over half of the world's

global capacity is located in just two regions – Canada and the former Soviet Union (specifically Russia and Belarus).

41.    Potash is a homogenous commodity product. Potash supplied by one producer is interchangeable with potash supplied by other producers. As a result, buyers make purchase decisions based largely, if not entirely, on price.

42.    Because the cost of potash is a relatively small part of total crop production costs, and there are no ready substitutes for the product, demand for potash is inelastic.

43.    The potash industry has very high barriers to entry. A single new mine requires approximately $2.5 billion or more in upfront costs, five to seven years of development time, and additional outlays for associated roads and other infrastructure. Such barriers are conducive to a conspiracy because they protect existing suppliers from competition and perpetuate the high market concentration.

**B.    High Market Concentration in the Potash Industry**

44.    During the Class Period, the potash industry has been dominated by relatively few companies that market, sell and distribute potash throughout the world and within the United States. Indeed, one analyst has observed that "the global trade in potash is even more concentrated than OPEC for oil." Another industry analyst referred to the small group of producers as the "Organization of Potash Exporting Countries."

45.    PCS is the largest potash supplier in the world, supplying nearly one-third of the world's potash. As of 2008, three producers in Canada (PCS, Mosaic and Agrium), and three former Soviet Union producers (Uralkali, Belaruskali and Silvinit) accounted for approximately 71% of the potash market exports. The market shares of these entities has not changed in any material way during the Class Period.

46.    This concentration of market share facilitated defendants' ability to implement the conspiracy.

### C.    High Level of Cooperation in the Potash Industry

47.    The potash industry is marked by a high degree of cooperation among supposed competitors. The major potash suppliers have joint ventures or overlapping ownership interests that involve competitors in the potash market. In addition to these formal business relationships, defendants have fostered a striking degree of cooperation through reciprocal visits to their production facilities participation in trade associations and attendance at industry conferences.

48.    PCS holds significant interests in a number of smaller potash suppliers throughout the world, including the following: (a) a 26 percent interest (and the right to nominate key financial, production and marketing personnel) in Arab Potash Company, a potash producer headquartered in Jordan, which in 2007 produced approximately 2 million tons of potash; (b) a nine percent interest in Israel Chemicals Ltd ("ICL"), which in 2005 produced 5 million tons of potash; (c) a 32 percent interest in Sociedad Quimica y Minera de Chile ("SQM"), a potash supplier located in Chile, which supplies about 1 million tons of potash per year; and (d) a 20 percent interest in Sinofert Holdings Limited, the largest potash distributor in China. Since 2005, PCS has been the exclusive overseas marketer for Intrepid Potash, the largest potash producer in the United States.

49.    PCS, Agrium and Mosaic are equal shareholders in Canpotex Ltd. ("Canpotex"), which acts as a unified sales, marketing and distribution company for these companies' potash supplies throughout the world – except in Canada and the United States. Each company has an equal voting interest in Canpotex as a shareholder through its nominees on the board of directors of Canpotex, and each company has agreed that it will not independently make offshore sales (with the exception of sales into the United States).

50.    Canpotex potash sales are allocated among the producers based on production capacity of each shareholder. If a shareholder cannot satisfy demand for potash by Canpotex, the remaining shareholders are entitled to satisfy that demand pro rata based on their allotted production capacity. In 2007, PCS supplied 55 percent of Canpotex's

requirements, Mosaic supplied 37.5 percent and Agrium supplied the balance. Through participation in Canpotex, PCS, Agrium and Mosiac have access to sensitive information about production capacity and pricing.

51.     Canpotex was initially formed to coordinate sales of potash produced in Canada, but it has entered into cooperative marketing agreements with producers from the former Soviet Union. For example, in January 2000 Canpotex agreed to form a joint marketing agreement with Uralkali. Under that agreement, Canpotex agreed to market Uralkali potash outside North America and Europe beginning in 2001.

52.     Producers from the former Soviet Union, like the Canadian producers, have consolidated sales and marketing of their potash supplies with a single entity, the BPC. Formed in 2005 as a joint venture between Uralkali and Belaruskali, BPC jointly markets and sells their potash throughout the world, including in the United States. With the combined potash supplies of Uralkali and Belaruskali, BPC supplies 34% of the world's exports of potash.

53.     Silvinit which supplies potash through the International Potash Company, is aligned with the other producers of potash in the former Soviet Union. Silvinit and Uralkali share common ownership by Dmitry Rybolovlev, who owns at least 66% of the stock of Uralkali and about 20% of the voting shares of Silvinit. Silvinit has been in active negotiations to join BPC, raising the prospect of further consolidation of the potash industry.

54.     According to news reports, representatives of the defendant companies have routinely held meetings during the Class Period as part of an "exchange program of mutual visits." The exchange of visits, according to defendants' representatives, "promote[d] the discussion of current issues affecting the potash industry and the sharing of experience."

55.     During one such visit, on October 11, 2005, senior executives of defendants met in the former Soviet Union and discussed, among other things, what could be deemed highly sensitive production plans of at least one of the world's largest potash suppliers.

This meeting was attended by William Doyle, President and CEO of Potash Corp.; Michael Wilson, President and CEO of Canpotex; James T. Thompson, Executive Vice President of the Mosaic Company; Vladislov Baumgertner, General Director, President and CEO of Uralkali; as well as other representatives of Belaruskali and Silvinit.

56.    A year later, in 2006, as part of the same "exchange program," a "delegation of Uralkali management" visited Mosaic Company in Canada. Mosaic's Executive Vice President, James Thompson participated in the visit with the companies from the former Soviet Union. During the visit, the delegation learned about the Mosaic "management structure" and toured potash mining operations of the company, including its most up to date mining technologies. The Uralkali visitors noted the "friendly attitude of the hosts" and exclaimed "[w]e were shown everything we wanted to see."

57.    Petr Kondrashev, Director General of Silvinit, acknowledged in a 2005 interview published in *The Chemical Journal,* which covers the potash industry, that the company has "old and friendly connections with potassium manufacturers from Belarus and [that] we still are pretty good partners." He added that "[q]uite often we have visiting groups from Belaruskali" and that representatives of Silvinit also visit the Belarus producer.

58.    Defendants have conducted numerous such visits during the Class Period, and these visits have provided opportunities to conspire and exchange highly sensitive competitive information.

59.    Defendants' high level of cooperation and their involvement in long-standing joint ventures has given these supposed competitors continuous opportunities to discuss pricing, capacity utilization, and other important prospective market information. The mutually beneficial nature of the business relations between defendants not only provided the opportunity to conspire, but it also created a financial incentive to do so.

**D.    Use of Trade Associates And Trade Events To Facilitate The Conspiracy**

60.    Plaintiff is informed and believes, and thereon alleges, that defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.

61.    Defendants are all members of International Fertilizer Industry Association ("IFA"), which sponsors annual conferences that are attended by senior officials of the defendants. In May 2007, representatives of PCS, Mosaic, Agrium, Belaruskali, Canpotex, BPC and others attended the 75th annual IFA conference in Istanbul, Turkey. At the IFA meetings, representatives of the manufacturers conferred about the potash market and "market tendencies." Significantly, during this May 2007 IFA conference, the major potash manufacturers announced an additional price increase on their potash products.

62.    In addition to the IFA, Defendants are members of the Fertilizer Institute which sponsors, jointly with the Fertilizer Industry Round Table, an annual conference titled the "Fertilizer Outlook and Technology Conference." The conference is geared towards industry members, financial analysts, business consultants, trade press representatives and government economists. At the Fertilizer Outlook and Technology Conference held in Arlington, Virginia on November 6-8, 2006, Michael R. Rahm, Mosaic Corporation Vice President, Market & Economic Analysis, presented an analysis of the potash industry. Representatives of at least one other defendant attended the same conference.

**E.    Defendants Coordinated Reductions in Manufacturing Capacity**

63.    Defendants implemented their conspiracy at least in part, through coordinated restrictions in potash output, which resulted in higher prices in the potash market.

64.    Defendants negotiate term contracts for purchases of potash throughout the world. Agreements made with buyers in India and China are typically made first and the prices established in those markets directly influence prices in other major markets.

65.    In early 2006, during difficult negotiations over potash prices, Canpotex and BPC (and their members) jointly restricted supply in an effort to compel Chinese buyers (the largest consumers in the world) to accept a price increase that would eliminate their "discount" and set a benchmark for other buyers around the world. The Chairman of Uralkali explained the action as follows: "here the point is not to supply [potash] to them with USD 30-40 discount, as earlier, but to adjust the prices to the level of the neighbor Asian consumers. Therefore we will never ship anything there, until we get a contract reasonable from out point of view."

66.    Consistent with this view, the leading suppliers of potash around the world jointly limited production of potash to bring Chinese consumers of potash in line with consumers in other countries, including the United States. Uralkali reduced its utilization rate during the first half of 2006 to 68% and PCS reduced its utilization to about 60%. Though the production restriction, Uralkali and PCS reduced their sales of potash by 23% and 20% respectively, from the prior year, this behavior served to discontinue the "discount" to China that existed prior to the negotiations. It led to a price increase for potash sales in China and, shortly thereafter, for sales throughout the world.

67.    In a December 2007 report, an industry analyst explained the episode as follows: The decline in 2006 production (-23% Y/Y) was mostly caused by the voluntary decision of Uralkali to reduce operating rates as price negotiations with China were delayed by several months. This was an industry-wide issue, as evidenced by Potash Corp.'s similar 20% decline in production. This behavior served to limit the decline in prices that China's hard line negotiations would have theoretically caused.

68.    Commenting on potash pricing in 2006, a Russian securities brokerage found "no fundamental factors to explain [the] decline of supply by potash producers" and viewed "simultaneous reduction of production capacities by companies in different parts of the world as motivated by their common wish to hold prices at the current high level...(or

even to push prices higher)." The brokerage added that "consumers have no alternatives to potash or means to store it as a guard against future higher prices."

69.    Defendants jointly restricted supply in 2007 in order to impose price increases in the potash market. On or about October 25, 207, Silvinit announced that it might have to suspend shipments of potash from one of its mines due to the presence of a sinkhole caused by mine flooding.

70.    Within a day of Silvinit's announcement, PCS, Uralkali, Agrium and BPC, all purportedly competitors, announced that they would suspend sales of their own potash because of the suspension of sales by Silvinit. Significantly, the announcement of PCS's suspension of sales was made, not by PCS, but by its supposed competitor, Uralkali. Uralkali also declared that "these decisions could have an upward impact on potash prices, including in those markets where Uralkali's potash is sold."

71.    Approximately 12 days later, on November 6, 2007, Silvinit resumed sales of potash, announcing that the sinkhole was advancing more slowly than had previously been feared. Within a day after Silvinit announced the resumption of its potash sales, Uralkali announced that BPC would also resume sales of Uralkali potash after the 12 day stoppage. Uralkali refused to explain the reason for resuming sales; however, a BPC official told a reporter the decision had been made "after studying the market."

72.    On November 7, 2007, PCS and Agrium announced that they would also resume potash sales.

73.    Shortly after these announcements that the major suppliers of potash were resuming sales, potash prices increased to "record highs on fears of a global shortage."

74.    Less than a year after the defendants jointly suspended potash sales because of the sinkhole discovered near Silvinit mine, Silvinit disclosed in May 2008 that another expanding sinkhole threatened its supply of potash and suggested that it might shut down production for two or three weeks. A spokesman for the company stated that "the situation is keeping us in suspense, but we are sure a crisis can be averted." Within two weeks, the

company announced that the sinkhole had stopped growing and "the situation can in no way get worse."

75.     Shortly after the disclosure of the threatened shutdown, prices for potash increased dramatically. On July 8, 2008, PCS announced that prices of potash to the United States would increase by $250 per ton, an increase of 48 percent over the previous price.

76.     During the Class Period, potash suppliers repeatedly attributed dramatic price increases to a "tight supply/demand balance" when in fact a number of defendants had excess potash capacity. These statements were a pretext to conceal defendants' conspiracy to restrict supply and fix prices of potash.

77.     Throughout the Class Period while potash suppliers repeatedly lamented the lack of supply, PCS repeatedly asserted that it had excess potash capacity. Likewise, in a December 2007 presentation to investors, Uralkali claimed that it had the "ability to add significant capacity on the cheapest basis vs. global peers." Moreover, the CEO of Mosaic, Jim Prokopanko, describing the potash market in 2008 explained that "the rally [in agriculture] is fundamentally different because it is being driven by demand, *not by supply shortages.*" (emphasis added).

78.     In January 2008, Mosaic released a report titled: "Why are Potash Supplies so Tight?" in which it explained that "[a]lthough all of the Canadian producers have expanded capacity, some projects have not started up on time and others have not operated as planned." The report falsely attributed the problem to "production hiccups" and increasing demand in world markets. In fact, agriculture economists believe that defendants' references to capacity as the root cause of recent price increases are mistaken because as one economist noted in a May 2008 *Wall Street Journal* article, "[t]here's not really a supply issue at the moment."

79.     Despite assertions of a current and future "tight supply/demand balance," the Food and Agriculture Organization of the United Nations estimates, based on 2007 data, that "[g]lobal potash supplies are expected to keep well ahead of total demand with

the surplus increasing from 5.7 to 6.7 million tons at an annual growth rat of 3%" through 2012.

80.    Throughout the Class period, defendants jointly coordinated restrictions in the supply of potash in order to increase prices for potash throughout the world and in the United States.

**F.    Defendants Collude on Prices for Potash**

81.    Plaintiff is informed and believes, and thereon alleges, that in order to control and maintain the profitability of potash, defendants conspired to fix, raise, maintain, and stabilize the price at which potash was sold in the United States at artificially inflated and anticompetitive levels.

82.    Defendants, ostensibly competitors in the potash market, publicly signaled their willingness to avoid price competition. For example, Uralkali admitted in 2006 that it sought to "ensure success of a 'price over volume' strategy" that would "[a]chieve long-term price stability."

83.    An industry analyst explained in 2007 that Uralkali "intends to follow a price over volume strategy whereby it will reduce its utilization rate from time to time to match potential declines in demand."

84.    Dmitry Rybolovlev, majority owner of Uralkali, and part owner of Silvinit, publicly acknowledged in an interview in April 2006 that "an acceptable price level is more important than expansion of market share and production." He added that "[w]e won't start a universal war in order to reduce prices…"

85.    Defendants have readily admitted that their joint ventures facilitate price stability in the potash market. In a presentation to investors, representatives of Uralkali extolled BPC's role as an "effective pricing tool" in the potash industry. A BPC official, noting the company had invited the Russian producer, Silvinit, to joint the joint venture, explained that "[w]e would not like to compete with Russian companies in the potash

market, that is why we offered Silvinit [an opportunity] to join the BPC on equal terms with everyone."

86.    BPC has acknowledged the purpose of this proposed consolidation is to enhance its market power. As one of its officials recently admitted, "[w]e will be the strongest and most powerful company that will set to a great degree the rules of the game in the world's potash market, which means billions of dollars."

87.    BPC's intention to set the "rules of the game" includes cooperation with Canadian producers. According to presentation made by Uralkali to company analysts, the "[t]wo major export associations [Conpotex and BPC] ensure [a] stable pricing environment" for potash.

88.    An outside analyst reached the same conclusion explaining that "BPC and Canpotex have a dominant role in setting annual prices with large potash customers such as China, India and Brazil."

89.    In 2007, after obtaining significant price increases for potash sales Vladimir Nikolaenko, BPC's Director General, claimed that "the company is not only an efficient pursuer of its shareholders' interest, but is actually *a leader to create an acceptable world market price condition for all manufacturers* of potash fertilizers." (emphasis added).

90.    Defendants' collusion is evidenced by unusual price movements in the potash market. Throughout the 1990s the potash industry was characterized by stable pricing, but during the Class Period this stability gave way to a remarkable run-up in potash prices to unprecedented levels. Spot prices for potash have risen exponentially during the last five years, with North American prices for potash rising approximately 60% in 2004-2005, and essentially doubling in 2007 and early 2008.

91.    The following chart illustrates how potash prices during the Class Period have dramatically deviated from historical patterns:



Source: Green Markets and Fertecon

92.    Defendants knew that their global conspiracy would directly impact prices of potash on world markets and within the United States. Representatives of Uralkali, in a presentation to analysts in December 2007, set forth each step in the chain of events resulting in increased prices throughout the world and in the United States: "[1] contract settlement in the key markets immediately tied up volumes of potash producers…[2] causing demand competition on SPOT markets followed by increase in prices…[3] conclusion of Indian contract on the back of the SPOT markets' growth – even less volume is available…[4] boom on SPOT market continues stimulating increased Chinese discount and a stronger reason to bring it down in 2008."

93.    Defendants' conduct in other countries impacted the potash market in the United States. Canada is the world's largest producer and exporter of potash, accounting for nearly a third of total production and 40 percent of world trade, and nearly half of Canada's exports go to the United States. The vast majority of potash sales in the United States are made by PCS, Mosaic, Agrium and BPC, at prices that are set according to benchmarks established by defendants based on sales in India, China and elsewhere.

94.    Between 2007 and early 2008, prices for potash in North America essentially doubled. According to data from the United States Department of Agriculture, the increase in potash prices far exceeded increases in the price of seeds (30%), livestock

(27%), and *even fuels* (43%). As one Goldman Sachs analyst recently commented, potash producers are simply able to *"raise prices at will."* (emphasis added).

## VIII.   EFFECTS OF DEFENDANTS' ANTITRUST VIOLATIONS

95.   Defendants' combination and conspiracy has had the following effects, among others:

a.   price competition in the sale of potash by defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

b.   prices for potash sold by defendant have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

c.   direct purchasers of potash from defendants have been deprived of the benefit of free and open competition in the purchase of potash.

96.   As a direct and proximate result of defendants' unlawful conduct, plaintiff and other members of the Class have been injured in their business and property in that they paid more for potash than they otherwise would have paid in the absence of the defendants' unlawful conduct.

## IX.    FRAUDULENT CONCEALMENT

97.   Plaintiff had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before the filing of this complaint. Defendants engaged in a secret conspiracy that did not give rise to facts that would put plaintiff or the Class on inquiry notice that there was a conspiracy to fix prices for potash.

98.    Because the defendants' agreement, understanding and conspiracy was kept secret, plaintiff and Class members were unaware of defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for potash.

99.    The affirmative acts of the defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

100.    By its very nature, defendants' price-fixing conspiracy was inherently self-concealing.

101.    Plaintiff and the Class members could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination. The contract, conspiracy or combination as herein alleged was fraudulently concealed by defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between the defendants by the use of the telephone or in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, limiting any explicit reference to competitor pricing communications on documents, and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

102.    As alleged above, in 2003, after years of stable and sometimes declining prices, the price of potash began to increase exponentially. Defendants falsely attributed the price increase to increasing global demand and limited supply. This was a pretext used to cover up the conspiracy. In fact, this price rise was the result of collusive conduct amongst defendants, which was undisclosed at the time.

103.    Plaintiff is informed and believes, and thereon alleges, that defendants' purported reasons for the price increases of potash were materially false and misleading

and made for the purpose of concealing defendants' anti-competitive scheme as alleged herein.

104. As a result of defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that plaintiff and the Class members have as a result of the anticompetitive conduct alleged in this complaints.

## X.    CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1

105. Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

106. Beginning at least as early as July1, 2003, the exact date being unknown to plaintiff and exclusively within the knowledge of defendants, defendants and their co-conspirators entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

107. In particular, defendants have combined and conspired to raise, fix, maintain or stabilize the prices of potash sold in the United States.

108. As a result of defendants' unlawful conduct, prices for potash were raised, fixed, maintained and stabilized in the United States.

109. The combination or conspiracy among defendants consisted of a continuing agreement, understanding and concerted action among defendants and their co-conspirators.

110. For purposes of formulating and effectuating their combination or conspiracy, defendants and their co-conspirators did those things they combined or conspired to do, including:

a.    participating in meetings and conversations to discuss the prices and supply of potash;

b.    communicating in writing and orally to fix prices;

c.    agreeing to manipulate prices and supply of potash sold throughout the world and in the United States, and to allocate customers of such products, in a manner that deprived direct purchasers of free and open competition;

d.    issuing price announcements and price quotations in accordance with the agreements reached;

e.    selling potash to customers in the United States at non-competitive prices; and

f.    providing false statements to explain increased prices for potash.

111.    As a result of defendants' unlawful conduct, plaintiff and the other members of the Class have been injured in their businesses and property in that they have paid more for potash than they otherwise would have paid in the absence of defendants' unlawful conduct.

## XI.    DAMAGES

112.    During the Class Period, plaintiff and the other members of the Class purchased potash directly from defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust violations herein alleged, paid more for potash than they would have paid in the absence of such antitrust violations. As a result, plaintiff and the other members of the Class have sustained damages to their business and property in an amount to be determined at trial.

## XII.    REQUEST FOR RELIEF

WHEREFORE, plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with plaintiff as the designated Class representative and its counsel as Class Counsel;

B.    Defendants have combined and conspired in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and that plaintiff and the members of the Class have been injured in their business and property as a result of defendants' violation;

C.    Plaintiff and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of plaintiff and the Class be entered against the defendants in an amount to be trebled in accordance with such laws;

D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the conspiracy or agreement alleged herein;

E.    Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.    Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.    Plaintiff and members of the Class receive such other or further relief as may be just and proper.

## XIII.   JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

DATED:        July 7, 2009                    Respectfully submitted,

                                              s/Steven A. Hart
                                              Steven A. Hart, Esq.
                                              (#6211008)
                                              Segal McCambridge Singer &
                                              Mahoney, Ltd
                                              233 S. Wacker Dr., Suite 5500
                                              Chicago, Illinois 60606
                                              Telephone: (312)645-7800
                                              Facsimile: (312)645-7711


                                              Thomas V. Girardi, Esq.
                                              (California Bar No. 36603)
                                              Keith D. Griffin, Esq.
                                              (California Bar No. 204388)
                                              GIRARDI │KEESE
                                              1126 Wilshire Blvd.
                                              Los Angeles, California 90017
                                              Telephone: (213) 977-0211
                                              Facsimile: (213) 481-1554

## <u>CERTIFICATE OF SERVICE BY ELECTRONIC MEANS</u>

     I, Steven A. Hart, one of the attorneys for plaintiffs, hereby certify that on July 7, 2009, service of the foregoing **Class Action Complaint for Damages and Equitable Relief** was accomplished pursuant to ECF as to Filing Users and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

<u>*s/ Steven A. Hart*</u>
Steven A. Hart